*Case No. 13-8301-JMH*

*A - Copy*

13 MAG 1501

Approved: _____
HARRY A. CHERNOFF
JASON H. COWLEY
Assistant United States Attorneys

JAMES M. KOUKIOS
MARIA GONZALEZ CALVET
United States Department of Justice
Criminal Division, Fraud Section

FILED by _____ D.C.

JUN 1 2 2013

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

Before:    THE HONORABLE HENRY B. PITMAN
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          -v-                     :

ERNESTO LUJAN,                    :

              Defendant.          :

- - - - - - - - - - - - - - x

SEALED COMPLAINT

Violations of
18 U.S.C. § 371
15 U.S.C. § 78dd-2
18 U.S.C. § 1952(a)(2)(A)
18 U.S.C. § 1956(a)(3)(A)
18 U.S.C. § 1956(h)
18 U.S.C. § 2

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ADAM KARCZEWSKI, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation and charges as follows:

COUNT ONE
(Conspiracy To Violate the Foreign Corrupt Practices Act)

        1.    From at least in or around December 2008 through
at least in or around October 2010, in the Southern District of
New York and elsewhere, ERNESTO LUJAN, the defendant, and others
known and unknown, willfully and knowingly did combine, conspire,
confederate and agree together and with each other to commit an
offense against the United States, to wit, violations of the
Foreign Corrupt Practices Act (the "FCPA"), Title 15, United
States Code, Section 78dd-2.

        2.    It was a part and object of the conspiracy that
ERNESTO LUJAN, the defendant, and others known and unknown, being
citizens, nationals, and residents of the United States and

officers, directors, employees, and agents of "domestic
concerns," as that term is defined in the FCPA, and stockholders
thereof acting on behalf of such "domestic concerns," would and
did make use of the mails and means and instrumentalities of
interstate commerce corruptly in furtherance of an offer,
payment, promise to pay, and authorization of the payment of
moneys, offers, gifts, promises to give, and authorizations of
the giving of things of value to foreign officials, and to any
person, while knowing that the money or thing of value will be
offered, given, or promised to a foreign official, for purposes
of (a) influencing acts and decisions of such foreign officials
in their official capacity, (b) inducing such foreign officials
to do and omit to do acts in violation of the lawful duty of such
officials, (c) securing an improper advantage, and (d) inducing
such foreign officials to use their influence with a foreign
government, and agencies and instrumentalities thereof, to affect
and influence acts and decisions of such foreign government, and
agencies and instrumentalities thereof, in order to assist LUJAN
and others known and unknown in obtaining and retaining business
for and with, and directing business to, any person, in violation
of Title 15, United States Code, Section 78dd-2.

<u>Overt Acts</u>

          3.    In furtherance of the conspiracy and to effect the
illegal object thereof, the following overt acts, among others,
were committed in the Southern District of New York and
elsewhere:

          a.    On or about June 5, 2009, Jose Alejandro
Hurtado (hereinafter, "Hurtado"), a co-conspirator not named as a
defendant herein, sent an email to ERNESTO LUJAN, the defendant,
and Tomas Alberto Clarke Bethancourt (hereinafter "Clarke"), a
co-conspirator not named as a defendant herein, with the subject
(translated from Spanish):[1] "Bonds." This email forwarded on an
email from Maria De Los Angeles Gonzalez De Hernandez, a/k/a
"Maria De Los Angeles Gonzalez" a/k/a "Mary" (hereinafter,
"Gonzalez").[2]

_____

          [1] Translations of emails written in Spanish were prepared by
translators who have certified that they are competent to conduct
such translations and further certified under penalty of perjury
that the translations are true and correct.

          [2] On March 12, 2013, a criminal complaint was filed against
Clarke, Hurtado, and Gonzalez. Complaint, <u>United States</u> v.
<u>Clarke et al.</u>, 13 Mag. 683 (S.D.N.Y.). On or about May 3, 2013,

b.     On or about, June 5, 2009, LUJAN responded to the email set forth above in subparagraph a.

c.     On or about December 2, 2009, Hurtado sent an email to LUJAN and Clarke attaching payment information that Gonzalez had provided.

d.     On or about March 29, 2010, Clarke sent an email to another employee of the Broker-Dealer who was based in New York, New York, with a "cc" to LUJAN, with a spreadsheet attached setting forth "payouts."

e.     On or about April 9, 2010, Hurtado sent an email to LUJAN and Clarke attaching payment information that Gonzalez had provided.

f.     On or about, April 9, 2010, LUJAN responded to the email set forth above in subparagraph e.

g.     On or about May 4, 2010, the Broker-Dealer in New York, New York, issued a check for approximately $2,500,000 to Associate 2 (defined below).

h.     On or about May 18, 2010, this check was deposited into an account in Switzerland held by a Panamanian company controlled by Clarke, ETC Investments SA.[3]

i.     On or about May 24, 2010, Associate 3 (defined below) sent an email to Clarke attaching for Clarke's signature an authorization to transfer $1,550,000 from that ETC Investments Account to an account in Switzerland held by a Panamanian Company called Castilla Holdings SA.

j.     On or about June 4, 2010, $1,550,000 was transferred from the account held by Castilla Holdings SA to an account held in the name of a company owned, in part, by Gonzalez.

(Title 18, United States Code, Section 371.)

---

all three defendants were arrested.

[3] This entity was also referred to as "ETC Investment, Inc." and "ETC Investment SA." For purposes of this Complaint, this entity is referred to as "ETC Investments."

## COUNT TWO
(Violation of the Foreign Corrupt Practices Act)

4.    Between on or about May 18 and June 4, 2010, in the Southern District of New York and elsewhere, ERNESTO LUJAN, the defendant, being a citizen, resident, and national of the United States and therefore a "domestic concern," as that term is defined in the FCPA, and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of such "domestic concern," made use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of offers, payments, promises to pay, and authorizations of the payment of any money, and offers, gifts, promises to give, and authorizations of the giving of things of value to foreign officials, and to any person, while knowing that the money or thing of value will be offered, given, or promised to a foreign official, for purposes of (a) influencing acts and decisions of such foreign officials in their official capacities, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, (c) securing an improper advantage, and (d) inducing such foreign officials to use their influence with a foreign government, and agencies and instrumentalities thereof, to affect and influence acts and decisions of such foreign government, and agencies and instrumentalities thereof, in order to assist LUJAN in obtaining and retaining business for and with, and directing business to, any person, to wit, LUJAN, acting as an intermediary, caused certain funds to be sent from the Broker-Dealer in New York, New York to Maria Gonzalez, a foreign official in Venezuela, in order to obtain and retain trading business directed by Gonzalez on behalf of a Venezuelan state-owned and state-controlled economic development bank to the Broker-Dealer.

(Title 15, United States Code, Section 78dd-2, and
Title 18, United States Code, Section 2.)

## COUNT THREE
(Conspiracy To Violate the Travel Act)

5.    From at least in or around December 2008 through at least in or around October 2010, in the Southern District of New York and elsewhere, ERNESTO LUJAN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A).

-4-

6.     It was a further part and object of the conspiracy that ERNESTO LUJAN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, would and did travel in interstate and foreign commerce and use the mail and facilities in interstate and foreign commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activities, namely, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00 and (c) commercial bribe receiving, in violation of New York State Penal Law Section 180.05; and thereafter would and did perform and attempt to perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3)(A).

<u>Overt Acts</u>

7.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.     On or about June 5, 2009, Hurtado, a co-conspirator not named as a defendant herein, sent an email to ERNESTO LUJAN, the defendant, and Clarke, a co-conspirator not named as a defendant herein, with the subject (translated from Spanish):  "Bonds."  This email forwarded on an email from Gonzalez, a co-conspirator not named as a defendant herein.

b.     On or about, June 5, 2009, LUJAN responded to the email set forth above in subparagraph a.

c.     On or about December 2, 2009, Hurtado sent an email to LUJAN and Clarke attaching payment information that Gonzalez had provided.

d.     On or about March 29, 2010, Clarke sent an email to another employee of the Broker-Dealer who was based in New York, New York, with a "cc" to LUJAN, with a spreadsheet attached setting forth "payouts."

e.     On or about April 9, 2010, Hurtado sent an email to LUJAN and Clarke attaching payment information that Gonzalez had provided.

-5-

f.     On or about, April 9, 2010, LUJAN responded to the email set forth above in subparagraph e.

g.     On or about May 4, 2010, the Broker-Dealer in New York, New York, issued a check for approximately $2,500,000 to Associate 2 (defined below).

h.     On or about May 18, 2010, this check was deposited into an account in Switzerland held by a Panamanian company controlled by Clarke, ETC Investments.

i.     On or about May 24, 2010, Associate 3 (defined below) sent an email to Clarke attaching for Clarke's signature an authorization to transfer $1,550,000 from that ETC Investments Account to an account in Switzerland held by a Panamanian Company called Castilla Holdings SA.

j.     On or about June 4, 2010, $1,550,000 was transferred from the account held by Castilla Holdings SA to an account held in the name of a company owned, in part, by Gonzalez.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Violation of the Travel Act)

8.     Between on or about May 18 and June 4, 2010, in the Southern District of New York and elsewhere, ERNESTO LUJAN, the defendant, unlawfully, willfully, and knowingly, would and did travel in interstate and foreign commerce and use the mails and facilities in interstate commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00, and (c) commercial bribe receiving, in violation of New York State Penal Law Section 180.05; and thereafter would and did perform and attempt to perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3)(A), to wit, LUJAN, acting as an intermediary, caused certain funds to be sent from the Broker-Dealer in New York, New York to MARIA GONZALEZ, a foreign official in Venezuela, in order to obtain and retain trading business directed by GONZALEZ on behalf of a Venezuelan state-owned and state-controlled economic

development bank to the Broker-Dealer.

(Title 18, United States Code, Sections 1952 and 2.)

## COUNT FIVE
### (Conspiracy To Commit Money Laundering)

9.    From at least in or around December 2008 through at least in or around October 2010, in the Southern District of New York and elsewhere, ERNESTO LUJAN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956.

10.    It was a part and an object of said conspiracy that ERNESTO LUJAN, the defendant, and others known and unknown, would and did transport, transmit and transfer funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A).

(Title 18, United States Code, Sections 1956(h))

## COUNT SIX
### (Money Laundering)

11.    Between on or about May 18 and June 4, 2010, in the Southern District of New York and elsewhere, ERNESTO LUJAN, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place inside the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A); to wit, LUJAN, acting as an intermediary, caused certain funds to be sent from the Broker-Dealer in New York, New York to an account in

-7-

Switzerland controlled by Gonzalez, to carry on the bribery
scheme described more fully below.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

12.   I am a Special Agent with the Federal Bureau of
Investigation ("FBI").  I have been an FBI Special Agent for
approximately two years, and I have personally participated in
the investigation described herein.  This affidavit is based upon
my conversations with others, including other law enforcement
agents, and my examination of reports and records.  Because this
affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.  Where
the contents of documents and the actions, statements and
conversations of others are reported herein, they are reported in
substance and in part, except where otherwise indicated.

### RELEVANT ENTITIES AND INDIVIDUALS

13.   At all times relevant to this Complaint, the
"Broker-Dealer" was a brokerage firm registered with the U.S.
Securities and Exchange Commission (the "SEC") and with its
principal place of business in New York, New York.  The Broker-
Dealer maintained desks at the New York and American Stock
Exchanges and had offices in New York, New York, as well as
Miami, Florida.

14.   Beginning in or around late 2008, ERNESTO LUJAN,
the defendant, was an employee of the Broker-Dealer based in
Miami, Florida.  LUJAN served as the Managing Partner of the
Global Markets Group of the Broker-Dealer and ran the Broker-
Dealer's Miami office.

15.   At all times relevant to this Complaint, Banco de
Desarrollo Económico y Social de Venezuela ("BANDES"), the
state-owned and state-controlled economic development bank of the
Bolivarian Republic of Venezuela, operated under the direction of
the Venezuelan People's Ministry of Planning and Finance.  BANDES
acted as the financial agent of the Venezuelan government in
order to promote economic and social development, serve as the
trustee for agencies of the public sector, and support the
expansion and diversification of Venezuela's infrastructure.

16.   Since approximately June 2008, and at all times

relevant to this Complaint, Gonzalez served as either the Vice President of Finance or Executive Manager of Finance and Funds Administration of BANDES. As such, Gonzalez was a "foreign official" as that term is defined by the FCPA. In these capacities, Gonzalez oversaw BANDES's trading abroad, and managed the relationship between the Broker-Dealer and BANDES, including trading by the Broker-Dealer on behalf of BANDES. Gonzalez was listed by the Broker-Dealer as the authorized trading contact for BANDES.

17. Beginning in or around late 2008, Clarke was an employee of the Broker-Dealer based in Miami, Florida. Clarke served as a Senior Vice President in the Global Markets Group of the Broker-Dealer. Clarke was listed as the Broker-Dealer's account opening salesman for the BANDES account.

18. Beginning in or about July 2009, Hurtado was an employee of the Broker-Dealer based in Miami, Florida. Prior to that, beginning in or around January 2009, Hurtado's spouse ("Hurtado's Spouse") was affiliated with the Broker-Dealer as a purported foreign finder.[4]

## OVERVIEW OF THE BRIBERY SCHEME

19. Based on the information set forth herein, there is probable cause to believe that ERNESTO LUJAN, the defendant, and others known and unknown, including Clarke and Hurtado, directed kickback payments to Gonzalez in exchange for Gonzalez steering BANDES business to the Broker-Dealer and authorizing BANDES to execute bond trades with the Broker-Dealer. The payments to Gonzalez represented a portion of the monies generated by the Broker-Dealer's bond trading activity in connection with BANDES. During this time period, with Gonzalez both acting as the authorized trading contact in regard to the Broker-Dealer and managing the relationship between BANDES and the Broker-Dealer, BANDES directed substantial business to the Broker-Dealer and carried out bond transactions that resulted in the Broker-Dealer generating tens of millions of dollars in revenue.

20. As part of the scheme, ERNESTO LUJAN, the defendant, received millions of dollars from the Broker-Dealer in

---

[4] The Financial Industry Regulatory Authority ("FINRA") has promulgated rules permitting compensation to be paid to non-registered "foreign finders" based on the business they direct to a registered broker-dealer if certain conditions are met.

a foreign account he controlled that were generated from the Broker-Dealer's mark-ups and mark-downs in connection with the securities it bought from and sold to BANDES. Specifically, millions of dollars generated from BANDES-related mark-ups and mark-downs were sent from the Broker-Dealer to ETC Investments, a foreign entity controlled by Clarke. A substantial portion of these funds were further transferred to (1) an account held by an entity owned jointly by Gonzalez and an associate of Gonzalez, "Associate 1" (the "Gonzalez Company"), and (2) an account held by an entity called Castilla Holdings SA ("Castilla"), and owned and controlled by LUJAN. LUJAN, in turn, passed on at least $1.5 million from this account held by Castilla onto an account held by the Gonzalez Company.

21. In order to promote this bribery scheme, ERNESTO LUJAN, along with others known and unknown, including Clarke, Hurtado, and Gonzalez, conspired to transmit and transmitted funds, constituting kickback payments, from accounts inside the United States to accounts outside of the United States. These accounts outside of the United States were controlled by, among others, Gonzalez, Associate 1, and the Gonzalez Company. I believe that LUJAN and others used middlemen and intermediary corporate entities to route these payments to Gonzalez in order to conceal these kickback payments.

<u>OVERVIEW OF THE BROKER-DEALER'S WORK FOR BANDES</u>

22. Starting in or around 2008, the Broker-Dealer established a group within the Broker-Dealer known as the Global Markets Group ("GMG"). The GMG primarily served institutional clients by providing fixed income trading services in the purchase and sale of foreign sovereign debt.

23. The GMG would, at a customer's direction, locate a bond the customer wished to purchase, purchase that bond, and then resell it to the customer at a higher price. The Broker-Dealer would retain this "mark-up." Conversely, when selling a bond on behalf of a customer, the Broker-Dealer would purchase the bond from the customer at a below-market price and then sell that bond on the market for a higher price. The Broker-Dealer would retain this "mark-down."

24. In November 2010, the SEC commenced a periodic examination of the Broker-Dealer. From November 2010 through March 2011, the SEC's staff made several visits to the firm's offices in New York, New York, to conduct the examination.

## BANDES TRANSACTIONS GENERATED SUBSTANTIAL REVENUE
## FOR THE BROKER-DEALER

25.  Based in part upon my review of documents obtained from the Broker-Dealer, I have learned that between in or around April 2009 through in or around June 2010, the overwhelming majority of revenue generated by the GMG resulted from the execution of bond trades for BANDES.  During this time period, the Broker-Dealer generated over $60 million in revenue from BANDES trading in fixed income investments, including Venezuelan bonds.

26.  Based in part upon my review of documents obtained from the Broker-Dealer and trading records I have reviewed, I have also learned of specific securities transactions that the Broker-Dealer carried out with BANDES that generated substantial revenue for the Broker-Dealer in the form of mark-ups, including the following:

a.  In or around late January 2010, Clarke caused the Broker-Dealer to execute at least two trades between the Broker-Dealer and BANDES for the same bonds on the same day. In other words, BANDES sold certain bonds and then shortly thereafter purchased back those same bonds.  The result of such trades was that BANDES was left with the same bond holdings as before the trades, except that it had paid the Broker-Dealer approximately $10.5 million in mark-ups in the course of the two round-trip transactions.  Specifically:

i.  First, on or about January 28, 2010, Clarke caused the Broker-Dealer to purchase from BANDES bonds issued by a Venezuelan state-owned electric utility ("ELECAR") for approximately $90,673,000.  Clarke on behalf of the Broker-Dealer then, on that same day, sold these same ELECAR bonds back to BANDES for approximately $95,953,000, resulting in a mark-up paid to the Broker-Dealer of approximately $5,280,000.

ii.  Second, on or about January 29, 2010, the Broker-Dealer purchased from BANDES a number of ELECAR bonds for approximately $90,017,014.  On or about the same day, the Broker-Dealer then sold these same ELECAR bonds back to BANDES for approximately $95,257,014, resulting in a mark-up paid to the Broker-Dealer of approximately $5,240,000.

b.  As described more fully below, I have reviewed documents obtained from the Broker-Dealer indicating that roughly half of the approximately $10.5 million in revenue generated by these mark-ups was designated to be paid as

-11-

kickbacks to Gonzalez.

### GONZALEZ RECEIVED KICKBACK PAYMENTS FROM BROKER-DEALER EMPLOYEES AND AFFILIATES BASED ON TRADES EXECUTED BY THE BROKER-DEALER FOR BANDES

27.  Based in part upon my review of documents obtained from the Broker-Dealer, financial records, emails obtained during the course of the investigation, and information provided by a confidential source of information in this matter ("CS-1"),[5] I have learned, in substance and in part, the following:

a.  As set forth further below, between at least in or around May 2009 through at least in or around August 2010, Gonzalez, both personally and through the Gonzalez Company, received kickback payments from employees of the Broker-Dealer and other individuals associated with the Broker-Dealer, including ERNESTO LUJAN, the defendant, Clarke, and Hurtado. These kickbacks were derived from revenue the Broker-Dealer generated from BANDES through executing trades for BANDES.

b.  LUJAN, Gonzalez, and others arranged for payments to be made to Gonzalez, in part, through payments directed to the Gonzalez Company and Gonzalez's co-owner of the Gonzalez Company, Associate 1.  These payments were made or directed by, among others, Clarke and Hurtado, who worked with LUJAN in the Miami, Florida office of the Broker-Dealer.  In turn, members of the conspiracy used intermediaries, including corporate entities, to convey these payments to Gonzalez.

### LUJAN'S PARTICIPATION IN THE SCHEME

28.  Based in part on information provided to me by CS-1, I have learned the following information, in substance and in part:

a.  LUJAN, Hurtado, and Clarke, among others

_____

[5] CS-1, a co-conspirator not named as a defendant herein, was charged by criminal complaint in United States v. Clarke et al., 13 Mag. 683 (S.D.N.Y.), for CS-1's participation in the scheme set forth herein.  See n.2.  There is no written agreement at this time between the Government and CS-1 resolving the charges against CS-1.  However, CS-1 is assisting federal law enforcement in the hope of entering into a cooperation agreement with the Government.  CS-1 has thus far provided accurate and reliable information that has been corroborated.

employed or affiliated with the Broker-Dealer, were involved in the scheme to send kickback payments to Gonzalez in exchange for Gonzalez steering BANDES business to the Broker-Dealer.

b.    Initially, LUJAN and others arranged for payments to Gonzalez to be routed through Hurtado.  Specifically, Hurtado's Spouse was signed up as a Foreign Finder with the Broker-Dealer.  Hurtado's share of Broker-Dealer revenue derived from BANDES business was relayed to Hurtado through payments to Hurtado's Spouse, and Hurtado then routed a portion of these funds to Gonzalez.

c.    After Hurtado's Spouse began efforts to seek United States citizenship, it became untenable to list her as a "foreign finder," purportedly living abroad. Accordingly, LUJAN and others at the Broker-Dealer arranged for Hurtado to become an employee of the Broker-Dealer.  Hurtado then received his share of the proceeds of the scheme in the form of salary and bonuses from the Broker-Dealer, and then routed a portion of these funds to Gonzalez.

d.    LUJAN, Clarke, and others devised a plan to sign up ETC Investments as a foreign finder and route millions of dollars from the Broker-Dealer to accounts overseas held by ETC Investments.  After Broker-Dealer payments were routed to ETC Investments, the majority of funds were then transferred to an account in Switzerland owned by LUJAN and held in the name of Castilla.  Later, a relative of Clarke's, "Associate 2," was used as a "foreign associate" by the Broker-Dealer.  The Broker-Dealer issued checks to Associate 2, which were then deposited into ETC Investments accounts overseas.  Eventually, instead of kickback payments being routed to Gonzalez through Hurtado, the payments to Gonzalez were made through ETC Investments.

29.    Based in part on my review of emails obtained during the course of the investigation, I have learned that ERNESTO LUJAN, the defendant, coordinated with Gonzalez to steer BANDES business to the Broker-Dealer.  The emails I have reviewed included the following:

a.    An email Gonzalez sent on or about June 3, 2009, to Hurtado with the subject (translated from Spanish): "Bonds."  Attached to the email was a document with information regarding certain bonds.  In the email, Gonzalez stated that she

-13-

was "chatting with Ernesto,"[6] and that he had inquired about "Ven 27," which I understand to be a reference to a set of bonds. Gonzalez stated in the email to Hurtado that she had informed Ernesto that Gonzalez had "turned over the portfolio to you."

        b.   An email Gonzalez sent on or about the following day, June 4, 2009, to Hurtado with the subject (translated from Spanish): "Bonds."  The email stated (translated from Spanish): "Hello! Enclosed please find the portfolio that you are going to negotiate for the Vnzl-27; it has to be valued on a daily basis to see if we can come out ahead.  It's in your hands."  On or about June 5, 2009, the following day, Hurtado forwarded this email to LUJAN and Clarke.  When forwarding the email from Gonzalez, Hurtado stated in his own email (translated from Spanish):

Good Morning, Guys,

Here you have more work (thank God).

We can start right away, so let's talk before starting.

A big hug.

AH

On that same day, LUJAN responded by email: "Perfecto."

        30.   I have reviewed the "foreign finder" agreements executed between Hurtado's Spouse and the Broker-Dealer and between ETC Investments and the Broker-Dealer.  Based on a review of the signature pages, I believe that ERNESTO LUJAN, the defendant, signed both agreements on behalf of the Broker-Dealer.

<u>EMAIL CORRESPONDENCE REGARDING PAYMENTS TO GONZALEZ</u>

        31.   I have reviewed emails between and among Broker-Dealer email accounts involving ERNESTO LUJAN, the defendant, that I believe reflect certain payments to be paid to Gonzalez. These emails include the following:

        a.   On or about March 29, 2010, Clarke sent an email to another employee of the Broker-Dealer who was based in New York, New York, with a "cc" to LUJAN.  Attached to the

---

[6] I believe that Gonzalez's reference to "Ernesto," was a reference to ERNESTO LUJAN, the defendant.

-14-

email was a document entitled "GMG Payout 02-2010.xlsx."  The attached document had a heading that read, in relevant part: "GMG Commission Breakdown for Month End."[7]  This document included a subsection entitled "Payouts," and included the following entries:

     i. "ETC Investment," with a total of approximately $3,219,700 referenced.

     ii. "Alejandro Hurtado Bonds," with a total of approximately $1,676,783 referenced.

     iii. "Economista," with a total of approximately $5,260,467 referenced.

   b. On or about April 21, 2010, Clarke sent an email to another employee of the Broker-Dealer who was based in New York, New York, with a "cc" to LUJAN.  The subject line of the email read: "Final numbers for Marz . . ."  Attached to the email was a document entitled "GMG Payout 03-2010.xlsx." The attached document had a heading that read, in relevant part: "GMG Commission Breakdown for Month End."[8]  This document included a subsection entitled "Payouts," and included the following entries:

     i. "ETC Investment," with a total of approximately $737,656 referenced.

     ii. "Alejandro Hurtado Equities," with a total $279.00 referenced, and "Alejandro Hurtado Bonds," with a total of approximately $668,339.50 referenced.

     iii. "Economista," with a total of approximately $107,985.50 referenced.

   32. CS-1 has relayed that "Economista" was one of the

---

[7] There is a reference in the attached document to "Nov-09." Based on the date of this email and the name of the attached document, however, I believe the reference to "Nov-09" is in error.  I have reviewed other emails indicating that these payout spreadsheets were circulated beginning in at least October 2009.

[8] There is a reference in the attached document to "Nov-09." For the reasons set forth in footnote 7 and based on the subject line of this e-mail, I believe the reference to "Nov-09" is again in error.

terms that ERNESTO LUJAN, the defendant, CS-1, and others used to refer to Gonzalez.

33. I have also reviewed email correspondence between Clarke and Hurtado that references amounts allocated to "Mary" that are essentially identical to the "payout" amounts for "economista" referenced in paragraph 31. These emails include the following.

a. On or about February 8, 2010, Clarke sent from his personal Bloomberg email account an email to Hurtado's Broker-Dealer email account, attaching a document with the file name "Alejandro y economista mes de feb.xlsx" (translated from Spanish: "Alejandro and the [female] economist month of Feb.") that contained several spreadsheets. One of the spreadsheets attached referenced $5,260,439 in commissions to "Mary."

b. On or about April 9, 2010, Clarke sent from his Broker-Dealer email account an email to a Gmail account used by Hurtado (the "Hurtado Gmail Account"). Attached to the email was a document with the file name "Alejandro y economista mes de mar.xlsx" (translated from Spanish: "Alejandro and the [female] economist month of March") that contained several spreadsheets. One of the spreadsheets attached referenced $107,985.50 in commissions to "Mary."

34. In comparing the amount allocated to "Mary" in the spreadsheet that Clarke sent to Hurtado on or about February 8, 2010 with the "payout" amount referenced for "economista" in the attachment to the email that Clarke sent to ERNESTO LUJAN, the defendant, on or about March 29, 2010, as referenced in paragraph 31a, the amounts are within $30.00.

35. In comparing the amount allocated to "Mary" in the spreadsheet that Clarke sent to Hurtado on or about April 9, 2010 with the "payout" amount referenced for "economista" in the attachment to the email that Clarke sent to ERNESTO LUJAN, the defendant, on or about April 21, 2010, as referenced in paragraph 31b, the amounts are identical.

36. I have also reviewed email correspondence obtained through search warrants indicating that ERNESTO LUJAN, the defendant, was aware that payments would be made to Gonzalez. These emails include the following:

a. On or about December 2, 2009, Hurtado sent from the Hurtado Gmail Account an email to personal email

-16-

accounts affiliated with ERNESTO LUJAN (the "Lujan Personal Email Account"), the defendant, and Clarke. The subject line stated "coordenadas" (translated from Spanish: "coordinates"). The email stated (translated from Spanish):

> Gentlemen,
>
> Here I'm sending the coordinates where Mary wants her money sent.
>
> Regards
>
> Alejandro Hurtado

Attached to the email was a document that included account information for a bank account in Switzerland held in the name of the Gonzalez Company.

> b. On or about April 9, 2010, Hurtado sent from the Hurtado Gmail account an email to the Lujan Personal Email Account and a personal account affiliated with Clarke. The subject line referenced the name of the Gonzalez Company and another entity. The email stated (translated, in part, from Spanish):

> Guys, here you have the instructions from la hormiga and parchita[.][9]
>
> Hugs
> AH

Attached to the email was bank account information for the Gonzalez Company and for the other entity referenced in the subject line of the email.

> c. On or about that same date, LUJAN responded to Hurtado (translated from Spanish):

> Hahahahahaha
> Fine

---

[9] According to the translation, the terms "la hormiga" and "parchita" translate literally to the "ant" and the "passion fruit." Based on information obtained during the course of the investigation, as confirmed by CS-1, I believe that those terms reference, respectively, Gonzalez and another BANDES employee involved in the scheme, Co-Conspirator 1 ("CC-1").

## LUJAN PAID GONZALEZ THROUGH CASTILLA

37.   My review of documents and records obtained during the course of the investigation reveals that ERNESTO LUJAN, the defendant, routed at least $1.5 million to Gonzalez. Specifically, LUJAN received millions from the Broker-Dealer that were routed through ETC Investments to an account in Switzerland that was held in the name of Castilla (the "Castilla Account"). LUJAN then routed at least $1.5 million from the Castilla Account to the Gonzalez Company.

38.   I believe that ERNESTO LUJAN, the defendant, owns and controls Castilla and the Castilla Account.  My basis for this belief includes the following:

a.   CS-1 has relayed that CS-1 is familiar with the movement of funds from ETC Investments to Castilla and that Castilla and the Castilla Account are owned and controlled by ERNESTO LUJAN, the defendant.

b.   I have reviewed email correspondence from another individual, "Associate 3," to ERNESTO LUJAN, the defendant, relating to the Castilla Account that suggests LUJAN is the beneficial owner of the Castilla Account, including the following:

i.   An email sent on or about September 25, 2009, from Associate 3 to the Lujan Personal Email Account.  The body of the email read, in relevant part: "Dear Mounsier Lujan, Please find attached the current position of Castilla as of September 24, 2009."  The email then included information regarding account performance.  Associate 3 also wrote: "Please do not hesitate to contact me, if you have any question[s]."  On or about that same date, LUJAN responded (translated from Spanish): "Thank you, Partner."

ii.   An email sent on or about October 1, 2009, from Associate 3 to Clarke, with a "cc" to the Lujan Personal Email Account.  Attached to the email was a bank transfer instruction for Clarke's signature to transfer approximately $2,835,831 from an ETC Investments Account to the Castilla Account.  The email requested that Clarke sign the attached document.

iii.   An email sent on or about August 6, 2010, from Associate 3 to Clarke, with a "cc" to the Lujan Personal Email Account.  The email referenced that Associate 3 was sending two documents with the email.  In regard to the first

-18-

document, the email stated (translated from Spanish): "ETC &[]
Cast: Please print it three times and then the two of you sign it
(place a signature on each page); and provide a signed set to
Alejandro that he can give to me in Europe." Attached to the
email was a an agreement between ETC Investments and Castilla.

39.  I also believe that millions of dollars from the
Broker-Dealer in New York, New York were routed through ETC
Investments to the Castilla Account.  My basis for this belief
includes the following:

a.  CS-1 has stated that CS-1 is familiar with
the movement of funds from ETC Investments to Castilla and that
substantial funds from the Broker-Dealer that were deposited into
ETC Investments accounts in Switzerland were then transferred to
the Castilla Account in Switzerland.

b.  I have reviewed an account statement (the
"ETC Account Statement") setting forth transactions in and out of
an ETC Investments account in Switzerland for the time period of
approximately January 2009 to October 8, 2009. This account
statement reflects that in total for this time period, ETC
Investments received approximately $9.5 million in "cash in" from
the Broker-Dealer.[10]  Of this amount, approximately $6,650,220,
or approximately 70%, was sent to Castilla.  The ETC Account
Statement also references the transfer of $2,835,831 that is
referenced above in subparagraph 38(b)(ii) as having taken place.

40.  Based on documents and records I have reviewed, I
believe that ERNESTO LUJAN, the defendant, sent at least $1.5
million to the Gonzalez Company with funds from the Broker-Dealer
that had been routed to the Castilla Account through a Swiss
account held by ETC Investments.  For example, I have learned
that:

a.  On or about May 4, 2010, the Broker-
Dealer in New York, New York, issued a check for approximately
$2,500,000 to Associate 2, and on or about May 18, 2010, this
check was deposited into an ETC Investments account in
Switzerland.

b.  On or about May 24, 2010, Associate 3 sent an
email to Clarke attaching for Clarke's signature an authorization
to transfer $1,550,000 from that ETC Investments account to the

---

[10] No other credits are reflected for this ETC Investments
account other than interest of less than $15,000.

Castilla Account held at the same Swiss bank. Then, on or about June 4, 2010, bank records reflect that $1,550,000 was transferred from the Castilla Account to a Gonzalez Company account in Switzerland.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named individual and that he be arrested and imprisoned, or bailed, as the case may be.

ADAM KARCZEWSKI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
10th day of June, 2013

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-20-